The next case this morning is number 519-0525, People v. Wasmund. Arguing for the appellant, William Wasmund, is Unsan Nam. Arguing for the appellate, People of the State of Illinois, is Max Miller. Each side will have 20 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. Good morning, your honors. Ms. Nam, are you prepared to proceed? Yes, your honor. You may proceed. Thank you. May it please the court, counsel, Assistant Appellate Defender Unsan Nam, on behalf of William Patrick Wasmund. We raised five arguments on appeal. Today, the order will be Argument 1, then Argument 4, and then Arguments 3 and 2, if time permits. In this case, Mr. Wasmund was convicted of first-degree murder and aggravated battery for the death of Jeffrey Spicer, who unfortunately died due to a loss of blood after being shot by a spring shotgun during the early morning hours of September 16, 2018, while committing a burglary on Mr. Wasmund's shed, which is property other than a dwelling. Today, we ask this court to either reverse his convictions outright, based on Argument 1, or reverse and remand for a new trial based on the remaining arguments. Turning to the first argument, the state failed to prove Mr. Wasmund's guilt beyond a reasonable doubt for first-degree murder and aggravated battery, specifically in that the state failed to prove that he was not justified in the force that he used to protect his shed from Spicer committing a burglary against his shed. This case involves an Illinois resident's statutory right to defend against and prevent the commission of forcible felonies against one's own property other than a dwelling. In Illinois, pursuant to 720 ILCS 5-738, property owners are justified in the use of force which is intended or likely to cause death or great bodily harm if the property owner reasonably believes that such force is necessary to prevent the commission of a forcible felony, and as we stated in Illinois, a burglary is a forcible felony. The state admits that Mr. Wasmund presented enough evidence supporting this affirmative defense so that the state was required to disprove the affirmative defense, which is the state's right to defend against and prevent the commission of forcible felonies against a burglary, and as the state notes, the standard is considering the evidence in the light most favorable to the state. Did Mr. Wasmund act in defense of his defensive property or did not act in defense of property? So simply put, here the evidence shows that Mr. Wasmund did act in defense of his property, and while the evidence together that supports all of his efforts to protect his property, it's important to consider the circumstances here. So prior to Spicer's death, Mr. Wasmund reported to law enforcement officers that he had been burglarized on numerous occasions. He also told the officers on the scene that can be seen in the body cam footage. Even the state's witness, Roger Ellett, stated that he helped Mr. Wasmund actually remove stuff from the shed on an incident prior to Spicer's death because he was trying to get some stuff out, trying to prevent these burglaries from happening. But it's clear that even Mr. Wasmund's friend, Tim Sumner, Sumner told Roger Ellett that burglaries were happening on this property and that things were being taken. So Mr. Wasmund took multiple steps. So he tried to remove stuff from the shed. He nailed the door of the shed shut. He put screws in there, put locks on there, but the locks were cut off. And in this case, the screws and the nails had been pried out of the door. Other methods that he tried to use was the metal chain that kind of blocks the driveway so that cars can't drive in. If this court looks at the exhibits, Mr. Spicer had to park by the side of the road because of this metal chain. There's also a lot of signs on the property telling people not to enter, not to trespass. So there's a no trespass sign that violators will be prosecuted under the law, that this is private property. And on the shed door, I believe the officers testified that there's a danger or warning or caution sign telling individuals not to enter. Furthermore, the only way to get into the shed was if a person would be premeditated to enter. So in this case, we see Mr. Spicer came with all these tools that officers find, such as the claw hammer, the ratchet set, which is specifically used to undo nuts and bolts. There's a flashlight, there's a pocket knife, and all of these things are in light of the fact that Mr. Spicer entered the property at an odd time. So it's either late at night or early, early in the morning before the neighbor finds Mr. Spicer, I believe at like seven. So it's the time, place, the manner, the fact that Mr. Bosman previously tried to protect his shed, not just by nailing and locking the shed door, but he tried to use razor blades before he tried to dig holes around his property to prevent burglars from entering. And I think that's the unique part of Illinois. I know the state refers to, below and on appeal, Florida and California statutes, but those statutes specifically, in the statute, the context requires a person's presence on the property that they're protecting. Mr. Bosman in Illinois does not have that explicit requirement that you have to be present to protect your property. But Council, the Rodriguez case, quoting from it, it says the use of force under those circumstances cannot be applied since this was an unoccupied structure. Well, according to the statute, Illinois does not have that requirement. But if this court considers, let's say, the Florida statute or the California statute, they talk about a person being able to stand their ground, a person not having to retreat, a person, if they reasonably believe that it's necessary to prevent the imminent commission of a forceful felony. In Illinois, there's no such requirement. But how can that be reasonable? My question is, how can that be reasonable to defend a shed when you're not there and when it's an unoccupied structure full of junk? Well, your honor, that goes to another point that we want to make. We asked this court to reject the state's argument below and on appeal that the statute makes this distinction that one cannot protect something that's worthless or not valuable to someone. Ignore that. Ignore that junk part of my comment. Yes, your honor. That was more of a factual statement than a legal issue. But then the California case points to the fact that to allow this would allow danger and imperil the lives of children, firemen, and policemen, to allow these kinds of IEDs. Yes, your honor. So there's, I guess, two parts to my answer. So first of all, even in the California statute, it talks about protecting someone they're in. So if this court looks at the statute, I think it's Penal Code 197. The statute specifically says the purpose of protecting against violence to any person they're in. So I think we go back to this being a matter of statutory construction. And the state agrees that this is a matter of first impression here, that this is a statutory construction issue. And pursuant to the statute versus the Florida and California statute, and even the California case, the statutes themselves have this requirement in there, while Illinois does not. And for reasonableness, in Illinois, we're arguing that a person's previous experiences. So here, the fact that Mr. Wasman knew that his property was being stolen, that all of these previous experiences, the fact that he tried to put razor blades, the fact that he tried to dig holes, all of the fact that those efforts didn't work, it led to this point. Plus, the fact here is to have this requirement, like the cases, Your Honor, stated Rodriguez or the California case, that's because there's statutes. And I believe one of the courts, one of the decisions talk about even going back to common law England, that at night, you're able to that the exception, there was an exception for spring guns at night, in England, because to protect your dwelling or your property. And here, again, we know this, the evidence here show that Mr. Spicer went on to the property, not during normal business hours, but at night. So we have... But counsel, doesn't the use of deadly force has to be reasonable? Yes, Your Honor. And how can he know whether it's reasonable if he's not there? Well, so going back this, first, the statute doesn't require it. Second, even if we're going apart from the statute... Even if the statute doesn't say that, but how can he know that it's reasonable if he's not there? Because of past experience... Because it may not be reasonable if it's, for example, if it's a child. Well, Your Honor, I think the reasonability here increases because Mr. Wasman did everything to make it so that unless you came with the premeditated intent to get into the shed, that one could not, right? So there were all the signs telling a reasonable person that you should not enter, you should not trespass, that there's a dangerous or cautionable issue with the shed. Further, Your Honor mentioned law enforcement officers, or let's say firefighters, because the neighbor, Jason Stiegel, was a firefighter. If this court refers to the 911 call, Mr. Stiegel and even the 911 dispatcher, as soon as they heard that this was Tiger Wasman's shed, they understood that a fire had happened here, they understood that this was abandoned. So if this court is about maybe a law enforcement officer or emergency personnel getting onto this property, they would know that with all the signs, with the fact that they understand that this is abandoned, or well, not abandoned, but that Mr. Wasman was not on the property, and with all of the caution signs, it would only lead to the... And so children wouldn't be able to get into it again, unless they had all of these tools to break the lock or the padlock, to pull out all of the nails and the screws. And even at that point, to try to get into this enclosed encounter, I think that goes to the reasonability. So he has the history of the shed being broken into, the history of all the thefts, the history of the fact that the police weren't able to help him, the fact that he tried other methods, less lethal methods that were not successful, and we have the statute on top of that, that specifically allows Illinois residents to protect their property. So I think all of this goes to the fact that Mr. Wasman acted reasonably, that he was justified in the force that he used, because again, a child would not be able to get into it. A child of the age of 12 or 13. So that's true, Your Honor. So if the child of 12 or 13 came with all of these tools to break into the shed, then I believe that still goes to the reasonableness, though. So Mr. Wasman did everything in his power to prevent a forcible felony. So again, I think the other issue is the legislature can amend the statute. So as written, there is no requirement. And to read the presence in the property would be to add an element or to add a factor or requirement into the statute that doesn't exist. But the legislature can, of course, amend the statute. They can at any time go change the statute to mimic Florida or California to make it more like their statute so that the presence is required. But as written today, as written when Mr. Wasman, when Spicer entered Mr. Wasman's shed or opened the shed door, that requirement is not in the statute. So again, that should be a matter for the legislature to change the statute if needed. If they believe that a person's presence is required, then they can, of course, use Florida or California as the example and mimic their statutes. Counsel, on the issue of reasonable belief that force is necessary to prevent the commission of a forcible felony, at least according to one item of testimony, this was not a situation where the defendant feared that someone was going to break into his shed. Generally, he had a specific suspect in mind, Bill Chapman. So obviously, in this situation, the judge's reasonableness, shouldn't we look at what he did with the information that he had to designate Chapman as a suspect? I haven't had a chance to review the record, I'm sorry, but was there any evidence of a police report? Any warning issued to Chapman that I know you've been burglarizing my shed, I want you to stop it? Anything to do with specifically acting to basically do something less than use deadly force to address the situation of someone he believed was breaking into his shed? So yes, your honor, I think Bill Chapman was the name that came up a lot. But I think that was just one of the people that Mr. Wasman suspected. It wasn't that it was definitely Bill Chapman and only Bill Chapman. I think the shed had been broken into multiple times. Mr. Wasman actually did make reports saying that he did, that shots were fired at him or that he did feel threatened. I know the officers stated that that report didn't go anywhere, that they found that it wasn't founded, but Mr. Wasman actually made those reports. He made a police report saying that he was shot at or that he did, there was some sort of threat to his life. So we have that part, at least again, the police didn't say it was founded or that they took it any further or that anyone was arrested from that, but he at least made those arguments. And if this court recalls some of the statements that he made, he stated that he did report this, that he took less lethal measures, such as the razor blades, the holes, the, what is it? The locking the shed so that no one could get in. He also made police reports and nothing happened. His shed kept getting burglarized. And so reasonably from his experience, from the past, knowing that no one was able to help him, he went, he took this measure. He took this, he took this action and it was justified pursuant to the law. So under Illinois statute, again, Illinois is a little bit unique in that there is no requirement for the person to be present. And I think the reasonableness, we can look at all of the circumstances here where Mr. Wasman believed that no one was helping him, that he kept getting burglarized. And as I stated to Justice Moore earlier, we asked this court not to find someone reasonable if they're protecting someone or if they're protecting something that's valuable. Here, Mr. Wasman did say that, you know, some of this stuff may be junk, but I believe in one of his statements, he stated that some of these things had a personal or emotional, he had a personal emotional attachment to them. So just because it's junk to someone else doesn't mean that it's necessarily junk to him. And in Illinois, there is no distinction. We're not, Illinois doesn't make that distinction that you can only protect something that's extremely valuable. So unless there's any other questions, I'm going to move on to argument four, which deals with trial counsel's ineffectiveness here. And it naturally links arguments two and three as well here. But I want to first focus on parts B and C, which are the video statements to police made by Roger Ellett, and Mr. Wasman's three statements. I want to before going into this, really emphasize the fact that Roger Ellett, who was the state's main witness, and who's the one that links or tries to link Mr. Wasman to this spring gun, was actually the prime suspect. So the police had an anonymous tip that it was actually Roger Ellett who set this up. But then Roger Ellett talks to the police, and he shifts the blame on to Mr. Wasman. So we have someone who was the prime suspect, who points the finger at Mr. Wasman, and now we have these two statements made to police. And so there's that credibility contest, which I'll get to if I have time, which I probably won't. But I do want to talk about how extreme and prejudicial these errors were. And again, the state doesn't really dispute the deficiency of trial counsel's representation for not suppressing the statements, for not redacting the statements. I'm out of time. I'll come back on rebuttal, your honors. Thank you. Any questions, Justice Moore? No. Justice Welch? No questions. State may proceed. May it please the court, counsel. My name is Max Miller, and I represent people of the state of Illinois. Just taking these issues in order, beginning with sufficiency of the evidence regarding the justified use of deadly force. So as defense counsel pointed out, this is an issue of first impression for Illinois. Illinois statute provides an individual may use deadly force to protect property, but he may only do so if he reasonably believed such force was necessary to prevent the commission of a forcible felony. Now in this case, we have a defendant who's not present on the property, and whose defense of the property relies on the illegal use of a weapon. And so he's incapable of determining whether such force was reasonably necessary due to his being present. Counsel, wasn't it also an illegal weapon? Yes, the spring trap itself, the shotgun was not in itself, but the spring trap is certainly illegal, and you are not allowed to use the shotgun in that manner. Absolutely. And therefore, this court should reject the proposition that one can be under a reasonable belief in the use of deadly force due to past experience and affirm the conviction. Now, the defendant first argues the state failed to dispute a reasonable doubt, and we pledge is, whether defendant's act of setting this shotgun was legally justified. Now, defendant is only justified in the use of force intended to cause death or great bodily harm, if he reasonably believes that such force is necessary to prevent commission of a forcible felony. And due to the lack of Illinois case law, the state below, and again, now looks at two specific cases from both Florida and California and Rodriguez versus state, a defendant argued basically someone could use deadly force to prevent crimes as burglary of an unoccupied structure or burglary of an unoccupied conveyance. The defendant reasoned such an eventuality was possible because the statute unjustified use of force allows deadly force to be employed in some circumstances to prevent commission of that felony. Now, the court noted, utilizing the reasoning of the Florida Supreme Court, the logic is that in order to use deadly force, there must be a reasonable belief that the use of deadly force is necessary to prevent. Now, as the state argued below and has been pointed out, and again, argues the state argues in its brief, if the defendant is not present, how can he say that he reasonably apprehended that such force is necessary, rather, the force that was going to be deployed was going to be deployed regardless of the circumstances, because it was set in motion long before this night took place. Now, the state also cited to the Supreme Court of California in their decision of people versus Caballos, where the Supreme Court of California said allowing persons at their own risk to employ deadly mechanical devices and perils last children, firemen and policemen acting within the scope of their employment. I mean, even the police who in this case had, you know, the trap not been disarmed, where the actor is present, there's always the possibility he will realize deadly force is not necessary. But deadly mechanical devices are without mercy or discretion. And this seems an undeniable fact that defendant was not there to decide whether the force is necessary. And this isn't reading something extra into the statute, the statute says that the use of deadly force must be reasonable. Well, what's reasonable, certainly, these factual circumstances are worth the sports consideration, you know, he was not there to know what was reasonable. Defendant concedes in the past, he used razor blades, dug holes, and he taken other steps to prevent burglaries unsuccessfully. He contends that these progressively more lethal means of defensive property were reasonably justified, because these steps in law enforcement were unable to prevent the burglary. You know, at the outset, again, the state just wants to emphasize, as Justice Moore asked about, but that a person commits the offense of unlawful use of weapons when he knowingly sets a spring gun. So that's violation of 720 ILCS 524-185. It seems to read a contradiction into Illinois law that an individual may unlawfully use a weapon to lawfully defend his property. And in the reply brief, defendant cites to a politically asking about like the use of an illegal weapon to defend someone's life. But the affirmative defense of necessity wasn't raised here and wasn't briefed and really isn't before this court. We're just talking about, you know, reasonable use of force. And certainly, this court is not under any requirement to read into a reasonable use of force, illegal use of a weapon. Additionally, defendants premises, he's protecting his property from burglary, but as the state suggested below, you know, it's not reasonable to claim he set the spring gun to guard against theft of property. He hadn't lived on this property for around two years due to a fire making the house uninhabitable. Property was in foreclosure with mortgage holder. Defendant himself stated in the police interviews that, you know, there wasn't anything left to steal or keep an eye on the property. That's States Exhibit 8. But defendant told police he hadn't even been to the shed in at least a year prior. Ultimately, though, if the defendant was not present on his property, he can't argue he was capable of assessing what he reasonably believed was necessary to prevent the commission of this burglary. The circumstances of someone else's presence on his property couldn't have been known to him. Although there, even though the entrance to the shed might circumstantially indicate burglary, the state demonstrated through the defendant's own inconsistent statements regarding the nature of the property, his alleged initial ignorance of the trap. Now, you know, the defendant was not justified in his use of force. He wasn't aware of the circumstances of Spicer's presence on his property. He couldn't judge the requisite level of force necessary to prevent. And so the state thinks that this court should affirm the conviction. Moving on to the, unless there are any questions, moving on to the prosecutor's comments and closing argument, the state maintains that these comments neither shifted the burden of proof nor misstated the law. These were not preserved. So we're looking at plain air. The defendant argues the state improperly shifted the burden of proof by stating that the defendant had access to all the evidence that the state had and the defendant was unable to adequately respond. Now, this court's where a prosecutor has wide latitude in making closing arguments and is permitted to comment on the evidence and any fair, reasonable inferences it yields. Although they may not argue assumptions or facts not in the record, a closing argument should be viewed in its entirety and the challenge remark should be viewed in context. Now, and statements would not be held improper if they're provoked or invited by defense counsel. Now the state began its rebuttal, arguing defense counsel had said the following three things in different contexts. The defense counsel said there's no question, the law is clear, there is no doubt. Now the state's referencing defense counsel's arguments from closing. Specifically in closing, defense counsel said there is no doubt the law gives defendant the right to use deadly force to prevent the commission of that burglary. Also, defense counsel said there's no question that Mr. Spicer was doing a burglary against my client's property at the time of his demise. Finally, he said the law in Illinois is clear, crystal clear, that one has the right, any property owner has the right, all of us to use deadly force to commit or prevent the commission of a forcible felony. Viewing the state's rebuttal in its entire context, this court should determine the state was responding to these claims made by defense counsel. The state argued the law was not clear on the basis of defense counsel's opinion, but the jury would be properly instructed as to what should be considered. The state moved on to address the Roger Ellett, he's totally unworthy of belief. Further, defense counsel stated we suggest it would be wrong to base a criminal conviction on his testimony. And just prior to these statements, defense counsel made the statement none of the forensic evidence came back as anything involving the defendant. Now, statements again will not be held improper if they're provoked or invited by defense counsel. So the state responds saying Roger Ellett's testimony brought the narrative of this case together. Specifically the state said, well look, Mr. Mansfield can tell you about what evidence we don't have, and you didn't hear evidence that we don't have, because I don't know how to present evidence we don't have. This is one of the comments challenged. This comment is merely an explanation of defense counsel's two claims. There's no forensic evidence, and Ellett's testimony was incredible. And the state was saying that this doesn't undermine the sum of the other present statements. The state argued that defense counsel had access to all the same evidence that the state had, and that statement should be interpreted in its appropriate context. It was made in direct reference to defense counsel's major challenge to the state's case, basically the lack of forensic evidence and the testimony of Ellett. Now the state was pointing out that the evidence provided additional to this, additional to this rather, which defense counsel had equal access to was sufficient for the conviction. As this court's well aware, circumstantial evidence is sufficient for a conviction. Defense counsel's argument implied that the lack of forensic evidence negated the finding of guilty verdict, because in its opinion the testimony of Ellett was incredible. Now the state was warranted in responding by stating that the evidence taken together in fact demanded conviction, and that defense counsel could come to the same determination. The state's remarks regarding the access to information was not a redirection of the burden of proof. Instead it was simply meant that defendant's objections did not overcome the uncontested evidence. Now defendant argues the state improperly argued regarding the value of the property and the applicability of defense chosen strategy. A prosecutor has wide latitude making these closing arguments, but there's no dispute as to the comments made by the state, merely their interpretation. Defendant argues that the state dangerously misstated the law by stating that a defendant could not defend his property from Spicer committing the burglary because there was nothing of value in the shed. But this misrepresents the state's argument. The state was focusing on the jury's attention on whether the use of deadly force was reasonably believed to be necessary. And certainly, although the statute may not explicitly state that the evidence of the police interview where the defendant says, you know, there's nothing in there worth stealing. And it's strange to say that if that is the case from the defendant's point of view, that he would also be under the reasonable apprehension that deadly force was necessary to defend this property with an illegal weapon. And so the state doesn't believe this was an improper comment. This is merely just trying to point out that although it's not incorrect statement to say you may use deadly force to defend your property, the manner in which that deadly force is employed certainly is relevant. So the state doesn't believe that the prosecutor improperly commented in any way. But despite the fact that no error occurred, this court should note that the evidence in this case, the state does not believe was closely balanced. The state provided testimony that late February, early March of 2018, Ellett and defendant rode down to defendant's help. Ellett asked defendant what he was doing while he was working. Defendant stated he was setting up a gun in the shed to scare Bill Chapman. Defendant was the property owner and owner of the gun, which had been rigged to kill Spicer. Now, Stegall testified that on September 16, 2018, he lived about 300 yards from the defendant's property. He's the firefighter. He's driving by. He sees this pickup truck with the door open on defendant's property. He pulls in. He sees a man laying next to the truck. He went to check on the man. He's laying in blood. He doesn't appear to be breathing, calls 911. Deputy Schildknecht, excuse me if I mispronounce his name, arrived. He testified that when he arrives, he sees this man lying on the side of the road next to the truck. They call in another law enforcement, the sheriff, state police, the state bomb squads, EMTs, all necessary because they realize that, you know, this property is, in a sense, in a sense, booby trapped. And he testified there were some unrelated individual stop as they were. Counsel, wasn't that shotgun loaded with birdshot? Yes, I believe so, your honor. It was actually determined during the autopsy that it's not specifically the shot that killed him, but the way that the gun was angled was such a hinge off the door. Yes, and it grabbed him and he bled to death. Is that what happened? Yes, your honor. The residual shot hitting this piece of metal as well caused it to break into pieces, which then punctured Spicer and caused him to, that caused his exsanguination. So it's actually kind of an unusual situation that actually caused the death when it wasn't the gunshot that actually penetrated his body and caused his death, but rather a hinge off the door that caused him to bleed. Yes, your honor. But I don't think that there's any, anything to suggest that a direct hit from the shotgun would not have killed him or that, that, you know, it's the, the intent that was being proven here was the intent to cause, you know, death and very bodily harm. And certainly the shotgun employed succeeded in that. But does your honor have any further questions regarding that specific? No, no. I just wanted to make sure everyone, including my colleagues were aware of the circumstances of how the death occurred. Yes, your honor. But just resuming with the evidence, you know, they follow this blood trail to the door. The shed appeared to be broken into, there's blood on the door, the door slightly ajar, metal hasp on the lock had been broken. The door had the appearance of being shattered apart with blood stains on it. Looking inside, a police officer could see a cord attached, which ran from the top of the door to the back of the shed and connected to a shotgun pointed at the door. Now Craddock testified he determined that a table and vice had been positioned in such a manner to be in perfect alignment with the doorway to the shed, as well as an eye screw on the back wall. Now a shotgun was found on the floor, but it appeared that the shotgun had been in the vice along with the rag, either to hold it in place or prevent damage to the shotgun after it went off. The shotgun was identified and it contained within its chamber a fired cartridge. Again, the forensic pathologist determined the body recovered multiple injuries. The death was from bleeding out and spices of blood to death from being shot with Jacobi stating in his notes that, you know, that the death was at the hands of the actions or neglect of another person, you know, determined that this wasn't an accident. Detective Heilman testified he first spoke with the defendant when law enforcement was waiting for their crime scene investigators to arrive. Heilman testified defendant and his girlfriend had driven up to the house after receiving information there was a police presence there. Later after the shed had been investigated, defendant was questioned regarding any other possible traps or devices that might arm officers on the scene. Defendant gave permission for officers to search the ground and he had those audio video recorded interviews. Now as the state noted in closing it was required to prove defendant performed the acts which caused the death of Spicer, specifically if the jury believed defendant set the spring gun, then that the spring gun was clearly the cause of Spicer's death. Secondly, the state had to prove that when setting the spring gun he did so knowing his acts would create a strong probability of death or great bodily harm to Spicer or another person. And finally that he was not justified. Now the state proved the defendant was the property owner, they set the spring gun, and that to defend it with lethal force the defense of the defendant should have resulted in the death of Spicer. And due to the overwhelming weight of that evidence we believe this court should affirm even if it found any of the prosecutor's statements to be improper. Moving on to the potential hearsay testimony that's claimed, the defendant failed to properly preserve these trial objections as well. So we're back into plain air. Defendant essentially posits that the state was improperly injecting unlawful evidence to the jury in order to manipulate their emotional state. Now defendant's assertion that the state was conducting a repetitive and intentional indoctrination of the jury to sympathize with Spicer is unwarranted. Now when the challenged activities are analyzed individually it's clear the state did not conduct itself improperly, and as no errors should be shown this court should affirm. Defendant first argues his trial was unfair because there was a group of people in the gallery who were wearing expressing sympathy towards Spicer who were witnessed by the jury during voir dire. Now no objection was raised by the defendant but the trial court went on the record stating you know it had a concern regarding the defendant's right to a fair and impartial trial. Balancing the public's first amendment rights against the rights of the accused the trial court concluded it would not allow any individual in the courtroom with that sort of attire. Further the trial court stated it would not permit any communication of partisan messages to potential jurors or jurors during deliberation process and that that will be during the entire length of proceedings. Now defendant's beginning a cumulative argument here alleging that the state invoked sympathy and inflamed the passions of the jury. However defendant has not cited any case law dealing with the issue of the public's dress during voir dire and the implication that such conduct is the responsibility of the state is unwarranted. Now defendant did not make any motion to have these be able to claim error as the trial court specifically stated that it was taking steps to preserve the integrity of the trial and use that as evidence that somehow the integrity of the trial was challenged. Secondly defendant argues that the state repeatedly emphasized during voir dire the gory nature of Spicer's death. Now the defendant argues that the state specifically warned potential jurors they would be required to look at graphic and gory photographs during trial. Now again the defendant doesn't cite anything that specifically says this is incorrect and concedes that the photographs may have been admitted to prove facts at issue but that error surrounding the photographs and Spicer's death were irrelevant and prejudicial. However defendant rather than considering the state that the state was being conscientious of the jury's potential responses to outbursts from the public court case an outburst that might have been anticipated especially considering the precautions the trial court had to take during voir dire the defendant asserts the state made sure that the jury heard these warnings repeatedly. Defendant suggesting that the jury could have been excused for the warnings but again doesn't provide anything that indicates that the decision not to do this was improper and the state would maintain therefore this court should not assume that it was. Thirdly defendant argues that the state used the word victim repeatedly as defendant concedes Illinois courts have not had much occasion to specifically confront the use of the word victim in a trial raising self-defense. Essentially the defendant argues that the special authority of the state used to refer to Spicer consistently as a victim prejudiced the jury. However defendant's argument that the state was conditioning the jury again is misplaced as the state admitted during closing argument am I telling you that Jeff Spicer was definitely not there to commit a burglary or a theft? No ladies and gentlemen I'm not. Further the state never maintained that the shotgun was set with the intention of killing Spicer specifically at all. In fact arguing it was possibly directed toward Bill Chapman. It certainly was not painting Spicer as some innocent person and using that in order to influence the jury. It was not necessary or intentional that the state used the word victim. I mean we're talking about someone who was who was killed you know the use of the word he was the victim of a shotgun blast but that was in no way to somehow suggest some sort of moral superiority or anything like that and I see I'm running out of time so unless this court has any questions state will rely on its brief for its remaining issues and respectful requests that this court affirm. Justice Moore? No other questions. Justice Welch? No questions. Miss Naum you may respond. Yes your honor so I do have a few points. The first point I want to make regarding the the spring shotgun the illegal use of a weapon. The trial court below kind of talked about this with the state a lot that the state could have charged him for the spring gun that the state could have charged him for any of the offenses related to the to the spring gun but the state did not. The state had the opportunity but it did not charge Mr. Wasman for anything. I believe they could have charged him with armed violence due to the spring gun all of the stuff that they could have very easily charged him with but they charged them with first degree murder and aggravated battery and in Illinois there is the affirmative defense of the defensive property other than a dwelling. So if they charge them otherwise this might be a different case but we have a case where they specifically charge them only for the first court looks at the transcripts for pages 788 to 790. The state apparently conceded below that where the trial court made this hypothetical with the machine gun. Of course in Illinois if anyone shoots anyone with the machine gun or has a machine gun that itself is illegal but the trial court asked the state well okay would you say that one cannot defend oneself with the machine gun just because the machine gun is illegal if someone is coming into my home and I use the machine gun. So the state below says well no and they talk about how they sometimes run into this with use of firearm by a felon because felons can't have fire guns but in cases of self-defense or defensive property that these illegal weapons may be used. So that's pages 788 to 790. So again the state could have charged him differently the state could have argued this below but they said well machine gun hypothetical we understand that this is there may be cases where illegal weapons can be used. So that's the first point and we want to emphasize again that this is a statutory interpretation matter that pursuant to the cases relied on by the state are persuasive they're not binding they're California and Florida cases those statutes that the the the courts relied on are pursuant to the statute the imminent the words imminent the the words you know the person they're in protecting the person they're in or standing your ground or the duty to retreat all of these contextually say that you have to be present to be able to utilize the defense but in Illinois those words do not exist for this court to read that in that would be an extra measure which we asked this court to leave to the legislature if they want to amend this of course they can do so and again the state stated that this is a contradiction it seems if an illegal weapon can be used but again the statute doesn't say illegal weapons are not allowable the trial court below specifically gave that hypothetical of a machine gun and if this contradiction is something that the legislature legislature wants to fix they can do that as well the the state went through all of the evidence that are more or less proper but there were a lot of prejudicial improper evidence that came in into place here and we're talking again the the biggest thing here was Mr. Wiseman's reasonableness so we argue again that he he didn't he didn't set up the spring spring gun but even if he did he was reasonable in doing so so this reasonableness goes to the improper evidence that came in such as elliot calling him a suspected arsonist that he set fire to his own home his own truck and then the officers call or comparing him to terrorists in the middle east while uh spicer is the the victim or the troops um are troops that are being killed in the middle east that's uh clearly from one of his statements to the police the officer brings it up saying Mr. Wiseman you're wearing a military jacket do you know how Mr. Spicer died in this case um it it resembles these IEDs or these explosive devices these bombs in the middle east that are and how it hit the hasp on the on the door kind of led to this bomb type of deal Mr. Wiseman being compared to the terrorists and on top of that the jury wanted to see this part of the video again during deliberations and the state elicited testimony about the bomb squads being called again we asked your honors to reverse outright for one or reverse and remand for a new trial based on the other four arguments unless there's any questions yes justice moore any questions no justice welch no questions thank you we'll take an advisement and an opinion or order will be issued